# COURT OF APPEALS OF VIRGINIA

## Record No. 0975-25-1

JOSE ALVARO GALDAMEZ ESCOBAR

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Malveaux, Friedman and Lorish

Argued at Norfolk, Virginia

Opinion Issued August 11, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie A. Taylor Arrington, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent Defense Commission, on briefs), for appellant.

Celtia R. Rokebrand, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE MARY BENNETT MALVEAUX

A jury convicted Jose Alvaro Galdamez Escobar ("Galdamez") of two counts of forcible sodomy with a victim under the age of thirteen, in violation of Code § 18.2-67.1(A)(1); three counts of aggravated sexual battery of a victim under the age of thirteen, in violation of Code § 18.2-67.3(A)(1); and three counts of custodial indecent liberties with a child, in violation of Code § 18.2-370.1. On appeal, Galdamez argues the evidence was insufficient to sustain his convictions because the complaining witness's testimony was inherently incredible. He also argues the trial

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

court erred in denying his motion to set aside the verdict based on newly discovered evidence. Finding no error, we affirm the trial court.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

At the time of the offenses, L.N.[2] was living with his mother, Mirna Cazun De La Rosa, and her boyfriend, Galdamez. De La Rosa came to the United States from Guatemala without her children in 2005. She met Galdamez at an apartment complex and the two formed a romantic relationship. In 2010, De La Rosa returned to Guatemala to bring her children to the United States. She paid smugglers to transport her children, but when they arrived at the border, L.N. was kidnapped, and she was told to pay the smugglers $100,000 to return him. De La Rosa could not afford the ransom, so Galdamez paid the majority of it.

When L.N. arrived in the United States, De La Rosa worked long hours to repay Galdamez. Galdamez was the primary caretaker for the children while De La Rosa worked. L.N. testified that, "[a]t first, it was all happy." He was an honor roll student but later became very distant and preferred to spend as much time at school as he could.

Galdamez drank heavily, and he became aggressive in his relationship with De La Rosa. The two disagreed about Galdamez disciplining the children. On one occasion, De La Rosa came home from work and saw L.N. "on his knees in the garage." L.N. testified that he was being punished for saying he would report Galdamez, for other misconduct, and he was beaten

---

[2] We use initials, instead of the victim's name, to protect his privacy.

so badly that he "literally bled off [his] back, and then [he] had to be isolated in the garage" until his mother came home and found him.[3]

L.N. testified that Galdamez sexually abused him while they lived together. L.N. stated that one of the first instances of sexual abuse occurred in 2010, when he was seven years old, while the rest of the family was out of town, when Galdamez touched his buttocks and took photographs of him. The sexual abuse became more frequent throughout the time he lived at Galdamez's home.

L.N. testified that Galdamez would undress him and force him to suck on Galdamez's penis. L.N. also testified that Galdamez would rub his face and hands against L.N.'s buttocks. While touching L.N.'s buttocks, Galdamez would say, "[t]his is what you do to people when you love them." When asked about other specific incidents, L.N. testified about a time when Galdamez "penetrate[d]" him "in [his] rear end." L.N. said this happened many times, but that instance was one he remembered specifically.

On another occasion, L.N. was playing outside when Galdamez pulled him into a bedroom and made L.N. "suck his dick until he got hard." Galdamez got completely naked and made L.N. take off his clothes. Galdamez then laid on his back on the bed, made L.N. "get on top of him," and anally penetrated him, which L.N. said "hurt." L.N. testified that during this incident, Galdamez threatened him, saying "if I said anything to anybody, I would get punished because I was undocumented, and he wasn't." These types of incidents continued to happen, and L.N. stated that on another occasion Galdamez "made [L.N.] get on top of him the same exact way," penetrated him anally, and "held [him] down until he finished." When asked how many times the abuse occurred, L.N. responded, "[i]t was countless. I was constantly getting

---

[3] The record does not indicate what other misconduct was the basis for L.N.'s threat to report Galdamez.

harassed." While recounting these incidents, L.N. testified as to which bedroom each act occurred in. He also testified that whenever he had a chance to get away, he would run off, lock the door behind him, and hide.

During these incidents, when L.N. "told him no," Galdamez would threaten L.N. saying that he was only a child and no one would believe him. Galdamez would also remind L.N. of his immigration status and told him to be afraid of police.

L.N. testified that he did not initially disclose the abuse to anyone because he had previously been punished for saying he would report Galdamez. He did testify that he told his mother about the abuse shortly after it began, but De La Rosa testified that she did not remember being told. When asked about his mother's failure to remember, L.N. again stated that he had told her about the abuse and said, "as time changes, people forget things."

Years later, when L.N. was seventeen, he was feeling very "lonely," "depressed," and "wanted to kill [him]self." L.N. crossed paths with a woman while moving, and during their conversation, "it just came out," and he disclosed the abuse to her. It was not until L.N. was eighteen and living on his own that he reported the abuse to the police. L.N. later confided in his cousin, who testified at trial and confirmed that L.N. reported the abuse to him and was "[s]ad and hurt" while discussing it.

L.N. testified that the abuse left him with an inability to trust others. He said that "[f]or the longest, I wasn't -- like, I couldn't even have regular relationships," and "I was afraid to even touch anybody. Like, I couldn't touch myself." He discussed not being able to have romantic relationships for years afterwards and he was "ashamed" and felt "disgusted" with himself. L.N. also testified that more recently, he has been in therapy and has "been better." At the time of trial, he was maintaining a relationship with a girlfriend.

- 4 -

Catherine Tricomi, a child forensic interviewer, testified at trial as an expert "in delayed disclosure, grooming, and demeanor and emotional response from victims of child sexual abuse." She testified that depending on the child's relationship with the offender, the child "can continue to have a relationship with that person. It keeps them from reporting the abuse for multiple reasons." Tricomi further testified that when a child is in a close or familial relationship with their abuser, the child may not disclose the abuse right away due to "there being possibly a financial hardship on the family if that person is gone, fear of not being believed, shame, embarrassment, if they've been threatened by that person, [or] other people finding out."

Tricomi also testified about how children remember abuse. She said that "[t]he more frequent [the] abuse is, the harder it is for them to be able to separate specific events and specific incidents, and they tend to blend the events together and not be able to chronologically walk through a specific event in complete detail." She further testified that when recounting sexual abuse, distress is the "typical demeanor" displayed by a child victim.

After the Commonwealth rested, Galdamez moved to strike the evidence, arguing that L.N.'s delay in reporting the abuse affected his credibility. The trial court denied the motion. At the close of all the evidence, Galdamez renewed his motion to strike, which the trial court also denied, finding that "[t]hese are issues that should go before the jury." The jury convicted Galdamez of all the charges.

After trial, but before sentencing, Galdamez filed a motion to set aside the verdict based on text messages L.N. sent to Galdamez's son, Jose Galdamez Chinchilla, soliciting a sexual encounter with him. At a hearing on the motion, Chinchilla testified that he received the first text after the trial concluded, and the two discussed work. He stated that on the following day, L.N. sent him three naked pictures of his buttocks and a message saying that L.N. "wanted me to fuck him." When Chinchilla responded that the pictures were not really of L.N., L.N. sent

- 5 -

another photo of his naked buttocks with a message saying, "I want to swallow your milk."[4]

After the hearing, the trial court denied the motion. In making its ruling, the trial court found that Galdamez "failed to convince it that the victim has testified falsely in this case" and that "the evidence produced here today would be irrelevant and specifically not material." This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Galdamez challenges the sufficiency of the evidence to sustain his convictions, arguing that L.N.'s testimony was inherently incredible as a matter of law as it was so "contrary to human experience and to usual behavior and was so manifestly false that reasonable people ought not believe it."[5]

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does

---

[4] Screenshots of the text messages, including the photographs, were admitted into evidence.

[5] Galdamez's assignment of error reads, "[t]he trial court erred in denying Mr. Galdamez's motions to strike where the complaining witness was inherently incredible as a matter of law *and the remaining evidence was insufficient to establish the essential elements of the crimes.*" (Emphasis added). However, on brief, Galdamez focuses on the inherent incredibility argument and only provides a one-sentence assertion that the remaining evidence was insufficient. Our Supreme Court has "repeatedly held that when an appellant makes a cursory argument in support of an assignment of error and fails to provide sufficient legal reasoning, factual analysis, or citations to authority, the argument is waived." *Pollack v. Va. State Bar ex rel. Seventh Dist. Comm.*, 304 Va. 451, 467 (2025); *see also* Rule 5A:20(e) (requiring that an appellant's opening brief contain "the argument (including principles of law and authorities) relating to each assignment of error"). Galdamez's alternative sufficiency of the evidence argument is therefore waived.

not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)).

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder," being the jury in this case. *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). As fact-finder, the jury is "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc). Therefore, "this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)).

The inherent incredibility standard presents a high bar on appeal, since "[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* And "[p]otential inconsistencies in testimony are resolved by the fact finder," not this Court. *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the

existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487

(quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

The record does not support Galdamez's assertion that L.N.'s testimony was inherently incredible. Galdamez emphasizes L.N.'s delayed reporting of the abuse, which he argues is "wholly unexplained" and "undermines the believability of his whole testimony." This delay was a matter for the jury to consider when weighing L.N.'s testimony but did not render his testimony incredible. "The mere fact that a witness may have delayed in reporting knowledge of a case or given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415; *see also Love v. Commonwealth*, 18 Va. App. 84, 89-90 (1994) (holding that a thirteen-year-old child's seven-year delay in reporting sexual abuse did not render her testimony inherently incredible). A victim's "failure to report an incident of sexual abuse for an unreasonably long period casts 'suspicion and doubt' on the victim's testimony, 'unless there is a credible explanation for such delay.'" *Wilson v. Commonwealth*, 46 Va. App. 73, 88 (2005) (quoting *Willis v. Commonwealth*, 218 Va. 560, 563 (1977)); *see also Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991) (finding that a victim's "youth, fright and embarrassment certainly provided the jury with an acceptable explanation" for the delay in reporting the sexual abuse).

Here, L.N. testified that he did not initially disclose the abuse to anyone because he had previously been punished for saying he would report Galdamez and was fearful his immigration status would be threatened. He also testified that he was ashamed and did not know what to do while the abuse was occurring. Tricomi's testimony confirmed that children often delay reporting their abuse due to fear, shame, and concern over negative consequences for the family. L.N.'s delay in reporting the abuse was therefore a circumstance "appropriately weighed as part

- 8 -

of the entire issue of witness credibility, which [was] left to the jury to determine." *Juniper*, 271 Va. at 415.

Galdamez also cites to other alleged inconsistencies in L.N.'s testimony related to the people to whom he disclosed the abuse, the dates of the abuse, L.N.'s recollection of how he escaped from Galdamez, and L.N.'s motives to lie. But "[t]estimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley*, 69 Va. App. at 626. L.N.'s testimony that Galdamez sexually abused him throughout his childhood was therefore not "so contrary to human experience as to render it unworthy of belief." *Id.* at 627. Accordingly, we hold that L.N.'s testimony was not inherently incredible as a matter of law, so this Court will not disturb the jury's credibility determination.

B. Newly Discovered Evidence

Galdamez argues that after the trial concluded, newly discovered text messages between L.N. and Galdamez's adult son warranted a new trial because it directly contradicted L.N.'s testimony "regarding the purported effects of the alleged abuse."

"Rule 3A:15(c) allows a trial court to 'grant a new trial if it sets aside the verdict' based on after-discovered evidence." *Lamm v. Commonwealth*, 55 Va. App. 637, 642 (2010). A motion for a new trial based on after-discovered evidence "is a matter submitted to the sound discretion of the circuit court." *Bagley v. Commonwealth*, 73 Va. App. 1, 22 (2021) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)); *see Johnson v. Commonwealth*, 41 Va. App. 37, 43 (2003) ("Motions for new trials based upon after-discovered evidence . . . are awarded with great reluctance." (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983))). "We will not reverse the court's decision except for an abuse of discretion." *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019) (quoting *Carter v. Commonwealth*, 10 Va. App. 507, 514 (1990)). To warrant a new trial, a party must show that the after-discovered evidence:

(1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

*Id.* (quoting *Odum*, 225 Va. at 130). "The moving party must establish each of these mandatory criteria." *Id.* (quoting *Commonwealth v. Tweed*, 264 Va. 524, 529 (2002)).

"Although after-discovered evidence merely impeaching a witness is generally not grounds for a new trial, the motion may be granted if the witness to be impeached is the 'key prosecution witness.'" *Id.* at 93 (quoting *Whittington v. Commonwealth*, 5 Va. App. 212, 216 (1987)). But "a defendant must still establish that the evidence is 'material to the extent that the outcome of the trial would have been affected.'" *Id.* (quoting *Lamm*, 55 Va. App. at 645).

Here, the trial court found that Galdamez failed to establish the fourth criteria of materiality.[6] "To prove materiality, a defendant must show that the new evidence 'should produce opposite results on the merits at another trial.'" *Id.* (quoting *Odum*, 225 Va. at 130). And a victim's "eventual recovery . . . d[oes] not require that the trial court grant appellant's motion for a new trial based on this evidence." *Lamm*, 55 Va. App. at 645 (finding evidence that the victim recovered her sense of taste and smell after the appellant's conviction for aggravated malicious wounding was immaterial because other independent evidence showed permanent and significant injury).

Contrary to Galdamez's assertion, the text messages do not negate L.N.'s testimony about the abuse itself nor challenge his recollection that the abuse occurred when he was a child. At trial, L.N. testified that the abuse left him with difficulty trusting others. He discussed being unable to have romantic relationships for years afterwards and feeling "disgusted" with himself.

---

[6] The first three criteria are not at issue in this appeal, and therefore, we only address the fourth criteria of materiality.

- 10 -

But L.N. testified that more recently, he had been in therapy and had "been better." He was also maintaining a romantic relationship at the time of trial. The jury was free to weigh L.N.'s testimony about the lasting effects of the abuse separate and apart from his testimony about the abuse itself. *See Rams v. Commonwealth*, 70 Va. App. 12, 38 (2019) ("[T]he trier of fact is free to believe or disbelieve, in whole or in part, the testimony of any witness."). The text messages were therefore not material to the sexual abuse L.N. endured as a child. Because Galdamez has not shown that the text messages should have "produce[d] opposite results on the merits at another trial," the trial court did not abuse its discretion in finding the evidence was not material and therefore did not warrant a new trial. *Odum*, 225 Va. at 130.[7]

## CONCLUSION

Accordingly, the trial court's judgment is affirmed.

*Affirmed.*

---

[7] Galdamez also argues that the trial court used the incorrect standard to evaluate the motion to set aside the verdict. He highlights a portion of the trial court's ruling where the court noted that the newly discovered evidence did not show that L.N. testified falsely. But this argument ignores the remainder of the trial court's ruling. In the entirety of its ruling, the trial court said, "[t]he Court finds that the defense has failed to convince it that the victim has testified falsely in this case. I find that the evidence produced here today would be irrelevant *and specifically not material*. Therefore, I deny the motion to set aside the verdict." (Emphasis added). Accordingly, the trial court used the proper standard to evaluate the motion, specifically finding that the evidence was not material. *See Odum*, 225 Va. at 130 (noting materiality as one of the four "mandatory criteria" to be used in evaluating a motion for a new trial based on newly discovered evidence).